James E. Cecchi
**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com

*Attorney for Plaintiff*
[*Additional Attorneys on Signature Page*]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID WISE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AVIS RENT A CAR SYSTEM, LLC,<br><br>Defendant. | Case No.: _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff David Wise ("Plaintiff"), by and through his undersigned counsel, hereby files this Class Action Complaint individually and on behalf of a class of all similarly situated persons ("Class Members") against Defendant Avis Rent A Car System, LLC ("Defendant" or "Avis"). Plaintiff bases the following allegations upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to him, which are based upon personal knowledge.

## NATURE OF THE ACTION

1.      Plaintiff brings this action against Avis for its failure to properly secure and safeguard individuals' highly valuable, protected, personally identifiable information including, *inter alia*, customers' full names, driver's license information, credit card numbers and expiration dates, dates of birth, and phone numbers (collectively, "PII"), as well as for Avis's failure to comply with industry standards to protect information systems that contain customer PII.

2.      Avis is a car rental service company that currently operates approximately 5,500 locations in more than 165 countries.[1]

3.      In order to provide its car rental services, Avis is entrusted with and sensitive customer PII. As Avis is or should have been aware, this type of personal and sensitive data is highly targeted by hackers who seek to exploit that data for nefarious purposes. In the wrong hands, these types of sensitive data may be wielded to cause significant harm to the individuals to whom the data relates.

4.      Because Avis knowingly collects and stores its customers' PII, Avis, in turn, has a resulting duty to secure, maintain, protect, and safeguard the PII with which it has been entrusted against unauthorized access and exfiltration through reasonable, adequate, and standard data security measures.

---

[1]      *Corporate Facts*, Avis, https://www.avis.com/en/about-avis/company-information/corporate-facts (last visited Oct. 2, 2024).

5.      Avis expressly recognizes this duty; for instance, Avis's Privacy Notice assures its customers that "[t]he security of personal information is important to us."[2]

6.      Despite Avis's duty to safeguard its customers' PII, Plaintiff's and Class Members' sensitive information was exposed to unauthorized third parties during a data breach of Defendant's business applications that occurred between August 3 and August 6, 2024 (the "Data Breach" or "Breach" herein).[3] The Data Breach resulted in the unauthorized access and exfiltration of the PII of approximately 300,000 of Defendant's current and former customers.[4]

7.      As a direct and proximate result of Defendant's failure to implement and follow basic, standard security procedures, Plaintiff's and Class Members' PII is now in the hands of cybercriminals.

8.      Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, and other harms caused by Avis's failure to safeguard their PII—risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

---

[2] *Privacy Notice*, Avis, https://www.avis.com/en/legal-documents/privacy-notice (last visited Oct. 2, 2024).

[3] *Notice Letter*, Avis, available at: https://www.maine.gov/cgi-bin/agviewerad/ret?loc=1225 (last visited Oct. 2, 2024).

[4] *Id.*

9.      As such, on behalf of himself and all others similarly situated, Plaintiff brings claims for negligence, negligence *per se*, and declaratory judgment, seeking damages and injunctive relief, including the adoption of reasonably sufficient data security practices to safeguard the PII in Avis's possession in order to prevent incidents like the Data Breach from reoccurring in the future.

## PARTIES

10.     Plaintiff David Wise is an adult who, at all relevant times, is a resident and citizen of the State of Alabama.

11.     Defendant Avis Rent A Car System, LLC, is a Delaware limited liability company with its principal place of business located at 379 Interpace Parkway, Parsippany, New Jersey, 07054.

12.     Upon information and belief, Defendant's sole member is Avis Group Holdings, LLC. Avis Group Holdings, LLC is a limited lability company with its principal place of business located in Parsippany, New Jersey, and its sole member being Avis Car Rental Group, LLC. Avis Car Rental Group, LLC is a limited lability company with its principal place of business located in Parsippany, New Jersey, and its sole member being Avis Budget Holdings, LLC. Avis Budget Holdings, LLC is a limited lability company with its principal place of business located in Parsippany, New Jersey, and its sole member being Cendant Finance Holding Co, LLC. Cendant Finance Holding Co, LLC is a limited lability company with its principal place of

business located in Parsippany, New Jersey, and its sole member being Avis Budget Group, Inc. Avis Budget Group, Inc. is a Delaware corporation with its principal place of business located in Parsippany, New Jersey. Defendant is a citizen of each of the States in which one of its members is a citizen. Defendant is therefore a citizen of the State of New Jersey.

13.    The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise who may be responsible for some of the claims alleged here are currently unknown to Plaintiff.

14.    Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of such responsible parties when their identities become known.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, because Plaintiff and at least one member of the Class, as defined below, are citizens of a different state than Defendant, there are more than 100 members of each of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

16.    This Court has personal jurisdiction over Defendant because Defendant's principal place of business is located in New Jersey. At all relevant times, Defendant has engaged in substantial business activities in New Jersey,

regularly conducts business in New Jersey, and has sufficient minimum contacts in New Jersey.

17.    This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1), because Defendant resides in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, Defendant conducts substantial business within this District, and Defendant has harmed Class Members residing in this District.

## FACTUAL BACKGROUND

**A.    Avis Collected and Stored, Plaintiff's and Class Members' PII**

18.    Since its founding in 1946, Avis has grown into one of the largest and most ubiquitous car rental companies in the United States.[5]

19.    Avis rents cars and offers related products, services, and protections, such as GPS navigation accessories, mobile applications, roadside assistance, and various rental insurance options.[6]

20.    In order to conduct its car rental business, Avis collects and stores a wide variety of customer PII, including, *inter alia*, customers' full names, driver's

---

[5] *Avis History*, Avis, https://www.avis.com/en/about-avis/company-information/historical-chronology (last visited Oct. 2, 2024).
[6] *Products and Services*, Avis, https://www.avis.com/en/products-and-services (last visited Oct. 2, 2024).

license information, credit card numbers and expiration dates, dates of birth, and phone numbers.

21.   In the ordinary course of doing business with its customers, Avis requires Plaintiff and Class Members to provide Avis with their PII. In its Privacy Policy, Avis lists the non-public information it collects from its customers, including the following:

> [Y]our name and contact information, birthdate, government identification, payment information, membership ID, program ID, whether you are a part of a corporate or rewards program, payment arrangements, insurance arrangements, and information related to your rentals or use of products or services we provide or enable.[7]

22.   Indeed, as part of obtaining Defendant's services, Plaintiff and Class Members are required to entrust their PII to Avis.

23.   Customers *must* provide this information in order to receive Avis's services; Avis informs its customers, "If you do not provide the information we request, we may not be able to provide our products or services to you."[8]

24.   By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Avis assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from unauthorized access, compromise, and exfiltration.

---

[7] *Privacy Notice*, *supra* note 2.
[8] *Id.*

25.    Avis expressly recognizes these duties, representing that, "The security of personal information is important to us. We take reasonable steps designed to protect personal information from unauthorized use, access, disclosure, alteration, destruction or loss."[9]

26.    Plaintiff and Class Members had a reasonable expectation, based in part on Avis's own statements, that their PII would be protected. However, despite its stated commitment to data security, Avis failed to adopt reasonable data security measures to prevent unauthorized access to Plaintiff's and Class Members' PII and allowed for the access to and the exfiltration of said information by unauthorized bad actors.

27.    Had Avis maintained its data security network and worked diligently to correct vulnerabilities, remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Avis could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

**B.    The Avis Data Breach**

28.    On September 5, 2024, Avis reported to the Offices of the Attorney Generals of Maine and California that it had been affected by a data breach. In its

---

[9] *Id.*

8

report to Maine, Avis indicated that the breach was related to "insider wrongdoing," though this statement is not further explained.[10]

29.    On or around this time, Avis began to distribute notice ("Notice Letters") to affected individuals.[11]

30.    In the Notice Letters, Avis described the circumstances surrounding the Data Breach as follows:

> We discovered on August 5, 2024, that an unauthorized third party gained access to one of our business applications. After becoming aware of the incident, we immediately took steps to end the unauthorized access, began an investigation with assistance from cybersecurity experts, and alerted the relevant authorities. Based on our investigation, we determined that the unauthorized access occurred between August 3, 2024, and August 6, 2024.[12]

31.    Once the malicious actor gained access to Avis's systems, hackers stole sensitive PII including, *inter alia*, customers' full names, driver's license information, credit card numbers and expiration dates, dates of birth, and phone numbers.[13]

---

[10] *Data Breach Notification*, Office of the Maine Attorney General (Sept. 5, 2024), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/ccfece24-0b9c-4251-a89b-0fd68ecbda12.html; *Data Breach Notification*, Office of the California Attorney General (Sept. 5, 2024) https://oag.ca.gov/ecrime/databreach/reports/sb24-591235.

[11] *Id.*

[12] *Notice Letter*, *supra* note 3.

[13] *Id.*

32.    Based on Avis's Notice Letter, it is evident that the bad actors accessed Defendant's computer systems in an intentional attack designed to acquire customers' valuable PII stored therein, and that the bad actors were successful in the attack.

33.    As a result of the Data Breach, the PII of approximately 300,000 individuals—including Plaintiff and Class Members—was exfiltrated and is now in the hands of cybercriminals.[14]

## C.    The Value of PII and Effects of Unauthorized Disclosure.

34.    Avis was well aware that the PII which it acquires is highly sensitive and of significant value to those who would use it for wrongful, nefarious purposes.

35.    Avis also knew that a breach of its computer systems, and exposure and exfiltration of the PII stored therein, would result in an increased risk of identity theft and fraud against the individuals whose PII was compromised.

36.    PII is a valuable commodity to identity thieves. As the Federal Trade Commission ("FTC") recognizes, identity thieves can use this information to commit an array of crimes including identity theft and financial fraud.[15] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII and

---

[14] *Data Breach Notification*, Office of the Maine Attorney General, *supra* note 10.

[15] *What To Know About Identity Theft*, Fed. Trade Comm'n Consumer Advice (Apr. 2021), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited Oct. 2, 2024).

other protected financial information on multiple underground Internet websites, commonly referred to as the "dark web."[16]

37.    Criminals often trade stolen PII on the "cyber black market" for years following a breach. Cybercriminals can also post stolen PII on the internet, thereby making such information publicly available.

38.    In a bulletin warning businesses of the dangers of this black-market trade, the FTC explains: "In many instances, data stolen from businesses ends up on the dark web where criminals buy and sell it to commit fraud, get fake identity documents, or fund their criminal organizations."[17]

39.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2023, there were 3,205 publicly disclosed data compromises, affecting over 353 million victims. The U.S. specifically saw a 72% increase in data breaches from the previous all-time high in 2021 and a 78% increase over 2022.[18] In tandem with the increase in data

---

[16] John Krebs, *The Dark Web: What Your Business Needs to Know*, Fed. Trade Comm'n Consumer Advice (Oct. 17, 2017), https://www.ftc.gov/business-guidance/blog/2017/10/dark-web-what-your-business-needs-know.
[17] *Id.*
[18] *2023 Data Breach Report*, Identity Theft Res. Ctr. (Jan. 2024), https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf.

breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2019, roughly 3.5 million people reported some form of identity theft, fraud, or other consumer complaint compared to 5.4 million people in 2023.[19]

40.     Rental car companies are prime targets for cybercriminals because they collect and store sensitive information including customer payment card information, personal information, and reservation details that can be used to commit identity theft. In conjunction with this information, the rental car industry has become a new target for cybercriminals in recent years, with rental car companies Zipcar and Sixt both reporting data breaches in 2022.[20]

41.     The consequences of Defendant's failure to keep Plaintiff's and Class Members' PII secure are long-lasting and severe. Indeed, the breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, credit and bank fraud, and more.

---

[19] *Facts & Statistics: Identity Theft & Cybercrime*, Ins. Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Key%20Facts (last visited Sept. 30, 2024).

[20] Swagath Bandhakavi, *Car Rental Company Avis Discloses Cyberattack & Data Breach*, Tech Monitor 30 (Sept. 9, 2024), https://www.techmonitor.ai/technology/cybersecurity/car-rental-company-avis-discloses-cyberattack-and-data-breach?cf-view.

42.    **Payment Card Information**—Cybercriminals can use stolen payment card information to create counterfeit payment cards and make unauthorized charges or withdrawals that can cause consumers to incur significant financial losses. Indeed, the counterfeit payment cards (or the compromised payment card information itself) can be used to purchase high-ticket goods or gift cards that can then be sold for cash all while charging the consumer's original card. Cybercriminals can also sell the stolen payment card information to other cybercriminals on the dark web. In turn, when a payment card is fraudulently used, it can damage the cardholder's credit score, making it difficult to obtain new credit in the future.

43.    **Driver's License Numbers**—are highly sought after by cyber criminals on the dark web because they are unique to a specific individual and extremely sensitive. This is because a driver's license number is connected to an individual's vehicle registration, insurance policies, records on file with the DMV, places of employment, doctor's offices, government agencies, and other entities.

44.    For these reasons, driver's license numbers are highly sought out by cyber criminals because they are one of the most valuable pieces of information to facilitate identity theft and fraud. This information is valuable because cyber criminals can use this information to open credit card accounts, obtain insurance policies and submit fraudulent claims, open cell phone contracts, file fraudulent tax

returns, file unemployment applications, as well as obtain bank loans under a person's name.

45.    Further, unlike credit or debit card numbers in a payment card data breach, which can quickly be frozen and reissued in the aftermath of a breach, the type of PII at stake here—unique driver's license numbers—cannot be easily replaced.

46.    A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[21]

47.    Stolen information can also be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to

---

[21] Erika Harrell, *Bureau of Just. Stat.*, U.S. Dep't of Just., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last visited Oct. 2, 2024).

gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

48.    A poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[22]

49.    Due to high-profile data breaches at other companies, Avis knew or should have known that its computer systems would be targeted by cybercriminals.

50.    Avis also knew or should have known the importance of safeguarding the PII with which it was entrusted and of the foreseeable consequences if its data security systems were breached. Avis failed, however, to take adequate cybersecurity measures to prevent the Data Breach and release of its customers PII from occurring.

**D.    Avis Failed to Comply with FTC Guidelines and Industry Best Practices**

51.    Avis is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or

---

[22] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, Forbes (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864.

affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

52.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[23]

53.    The FTC recommends that companies verify that third-party service providers have implemented reasonable security measures.[24]

54.    The FTC recommends that businesses:

    a.    Identify all connections to the computers where sensitive information is stored;

    b.    Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

---

[23] *Start with Security: A Guide for Business*, Fed. Trade Comm'n (June 2015) https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[24] Erika Harrell, *Bureau of Just. Stat.*, U.S. Dep't of Just., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last visited Oct. 2, 2024).

c.    Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

d.    Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e.    Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f.    Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g.    Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an

17

attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h.    Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i.    Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

55.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the

FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

56.    Upon information and belief, Avis failed to properly implement one or more of the basic data security practices described above. Avis's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII resulted in the unauthorized access to and exfiltration of Plaintiff's and Class Members' PII.

57.    Avis's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

58.    Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[25]

59.    NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security

---

[25] *See Framework for Improving Critical Infrastructure Cybersecurity*, National Institute Of Standards & Technology (April 16, 2018), Appendix A, Table 2, available at https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

controls, network monitoring, breach detection, and incident response.[26] Upon information and belief, Avis failed to adhere to the NIST guidance.

60.    Further, cybersecurity experts have identified various best practices that should be implemented by car rental businesses, including the following:

a.    Encrypting customer information during online reservations and transactions;

b.    Regularly updating software;

c.    Implementing strict password policies;

d.    securing payment gateways for online transactions;

e.    Implement employing training on how to recognize and prevent cyber threats and how to respond in the event of one;

f.    Establish an implement response plan;

g.    Implement physical safeguards to secure routers servers, and other networking equipment; and

h.    Implement regular penetration testing, vulnerability scanning, and intrusion detection systems.[27]

---

[26] *Id.* at Table 2 pg. 26-43.
[27] Bandhakavi, *supra* note 20.

61.    Upon information and belief, Avis's failure to protect Plaintiff's and Class Members' PII is a result of its failure to adopt reasonable safeguards as required by the FTC, NIST, and industry best practices.

62.    Avis was, at all times, fully aware of its obligation to protect the PII of consumers because of its business model of collecting PII and storing payment information. Avis was also aware of the significant repercussions that would result from its failure to do so.

**E.    Plaintiff and Class Members Suffered Damages**

63.    The ramifications of Avis's failure to keep consumers' PII secure are long lasting and severe. Avis's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways, including theft of their PII as well as substantial and imminent risk of identity theft and fraud. Plaintiff and Class Members must immediately devote time, energy, and money to: (1) closely monitor their bills, records, and credit and financial accounts; (2) change login and password information on any sensitive accounts even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in social engineering, spear phishing, or extortion attacks; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

64.    In 2019, the GO released a report addressing the steps consumers can take after a data breach.[28] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. It is clear from the GAO's recommendations that the steps data breach victims (like Plaintiff and Class Members) must take after a data breach, like Avis's, are both time-consuming and of only limited and short-term effectiveness.

65.    The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[29]

66.    Avis itself recognizes the certainly impending and increased risk of identity theft and fraud that Plaintiff and Class Members now face, as it has offered

---

[28]    Government Accountability Off., "Data Breaches" (Mar. 2019) https://www.gao.gov/assets/gao-19-230.pdf.

[29]    *See Identity Theft Victim Checklist*, Fed. Trade Comm'n, https://www.identitytheft.gov/Steps (last visited Oct. 2, 2024).

its current and former customers who were impacted by the Data Breach twelve months of identity protection services and further advised those individuals to "remain vigilant against incidents of identity theft and fraud" by "regularly reviewing and monitoring [their] account statements and credit history for any signs of unauthorized transactions or activity."[30]

67.    Further, once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse.

68.    It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and also between when PIIs stolen and when it is used. According to the GAO, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[31]

69.    For these reasons, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly for their entire lives, as a result of Avis's conduct.

---

[30] *Notice Letter*, *supra* note 3.
[31] *See* 2007 GAO Report, at 29.

70.    Additionally, the value of Plaintiff's and Class Members' PII has been diminished by its exposure in the Data Breach. Indeed, PII is a valuable commodity to identity thieves, and, once it has been compromised, criminals will use and trade the compromised PII on the cyber black market for years thereafter.[32]

71.    The reality is that cybercriminals seek nefarious outcomes from a data breach and stolen PII can be used to carry out a variety of crimes.

72.    Plaintiff and Class Members are also at a continued risk because their information remains in Avis's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Avis fails to undertake the necessary and appropriate security and training measures to protect its customers' PII.

73.    As a result of Avis's failures, Plaintiff and Class Members face an increased risk of identity theft and fraud, phishing attacks, and related cybercrimes because of the Data Breach. Those impacted are under heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

---

[32] *The Price Cybercriminals Charge for Stolen Data*, Trustwave (Aug. 6, 2023), https://www.trustwave.com/en-us/resources/blogs/spiderlabs-blog/the-price-cybercriminals-charge-for-stolen-data/.

74.    Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private information to strangers and cybercriminals.

## F.    Plaintiff's Experience

75.    Plaintiff is a customer who has used Avis's car rental services. As a condition of renting cars through Avis, Plaintiff was required to entrust Defendant with his PII.

76.    In obtaining, collecting, using, and deriving a benefit from Plaintiff's PII, Avis assumed legal and equitable duties to act reasonably in its handling of Plaintiff's PII. Avis, however, did not take reasonable care of Plaintiff's PII, leading to its exposure and compromise as a direct and proximate result of Avis's inadequate security measures.

77.    On or about September 4, 2024, Plaintiff received a Notice Letter from Avis informing him that his PII had been compromised in the Data Breach.

78.    Since the occurrence of the Data Breach, Plaintiff has experienced actual misuse of his PII as he has received dark web alerts from Experian indicating that his PII is on the dark web.

79.    Since the occurrence of the Data Breach, Plaintiff has also been required to spend his valuable time and effort in an attempt to mitigate any misuse of his PII. These mitigation efforts include spending time changing his account

passwords, spending time placing a freeze on his credit, and monitoring his accounts for suspicious activity. Plaintiff would not have had to undertake these time-intensive efforts but for the Data Breach.

80.     Plaintiff has suffered actual injury from having his PII exposed and/or stolen as a result of the Data Breach, including: (a) actual misuse of his PII; (b) mitigation efforts to prevent the misuse of his PII; (c) damages to and diminution of the value of his PII, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (d) loss of privacy.

81.     In addition, knowing that hackers accessed and likely exfiltrated his PII and that this information likely has been and will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

82.     As a direct and proximate result of the Data Breach, Plaintiff has been and will continue to be at a heightened risk for fraud and identity theft and its attendant damages for years to come. Such a risk is real and certainly impending and is not speculative given the highly sensitive nature of the PII compromised in the Data Breach.

## **CLASS ALLEGATIONS**

83.    Plaintiff brings this case on behalf of himself and all other similarly situated Class Members pursuant to Rule 23 of the Federal Rules of Civil Procedure.

84.    Plaintiff seeks to represent a class of persons to be defined as follows:

All persons in the United States whose PII was impacted in the Avis Data Breach which was announced on or about September 5, 2024 (the "Class").

85.    Excluded from the Class are Defendant, its subsidiaries and affiliates, its officers, directors, and members of its officers' and directors' immediate families, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of those judicial officers' immediate families.

86.    Plaintiff reserves the right to, after conducting discovery, modify, expand, or amend the above Class definition or to seek certification of a class or subclasses defined differently than above before any court determines whether certification is appropriate.

87.    **Numerosity.** Plaintiff is informed and believes, and thereon alleges, that there are, at minimum, hundreds of thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Avis's records, including but not limited to the files implicated

in the Data Breach, but, based on public information, the Class includes approximately 300,000 individuals.

88. **Commonality.** This action involves questions of law and fact that are common to the Class Members. Such common questions include, but are not limited to:

a. Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;

b. Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' PII;

c. Whether Defendant had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

d. Whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII;

e. Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

f. Whether Defendant breached its duties to exercise reasonable care in handling Plaintiff's and Class Members' PII;

g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.    Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

i.    Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

j.    Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

89.    **Typicality.** Plaintiff's claims are typical of the claims of Class Members. The claims of Plaintiff and Class Members are based on the same legal theories and arise from the same failure by Defendant to safeguard their PII. Plaintiff and Class Members entrusted Defendant with their PII, and it was subsequently obtained by an unauthorized third party.

90.    **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendant to obtain relief for himself and for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff has also retained counsel that is competent and experienced in complex class action litigation of this type, having previously litigated data breach cases. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

91. **Superiority.** Class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy. Individual litigation by each Class Member would strain the court system because of the numerous members of the Class. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

92. **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Avis's liability and the fact of damages is common to Plaintiff and each member of the Class. If Avis breached its duties, then Plaintiff and each Class Member suffered damages by that conduct.

93. **Injunctive and Declaratory Relief.** Consistent with Fed. R. Civ. P. 23(b)(2), Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

94.     **Ascertainability.** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Avis's books and records.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

95.     Plaintiff restates and realleges the allegations contained in paragraphs 1 through 94 as if fully set forth herein.

96.     Avis owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

97.     Specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems to ensure that Plaintiff's and Class Members' PII in Avis's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

98.     Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

99.    Avis had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing valuable PII that is routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

100.    Avis also owed a common law duty because its conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendant's conduct included its failure to adequately restrict access to its computer networks and/or servers that held individuals' PII.

101.    Avis also knew or should have known of the inherent risk in collecting and storing massive amounts of PII, the importance of implementing adequate data security measures to protect that PII, and the frequency of cyberattacks such as the Data Breach in the financial sector.

102.    Avis is subject to an "independent duty," untethered to any contract between Defendant and Plaintiff and Defendant and Class Members. The sources of Avis's duty are identified above. Avis breached the duties owed to Plaintiff and Class Members and thus was negligent. Avis breached these duties by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer

information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of implemented safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies provided to its customers; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII.

103.    But for Avis's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII would not have been accessed and exfiltrated by cybercriminals.

104.    As a direct and proximate result of Avis's negligence, Plaintiff and Class Members have suffered injuries including:

    a.    Theft of their PII;

    b.    Costs associated with requesting credit freezes;

    c.    Costs associated with the detection and prevention of identity theft;

d.      Costs associated with purchasing credit monitoring and identity theft protection services;

e.      Lowered credit scores resulting from credit inquiries following fraudulent activities;

f.      Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g.      The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

h.      Damages to and diminution in value of their PII entrusted to Avis with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others; and

i.      Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class Members.

105.   As a direct and proximate result of Avis's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

106.   Plaintiff restates and realleges the allegations contained in paragraphs 1 through 94 as if fully set forth herein.

107.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Avis for failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duties.

108.    Avis violated Section 5 of the FTC Act by failing to use reasonable measures to protect customers' PII and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of a data breach.

109.   Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

110.   Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ

reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

111.   Avis's violation of Section 5 of the FTC Act constitutes negligence *per se*.

112.   As a direct and proximate result of Avis's negligence, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 104 above.

113.   As a direct and proximate result of Avis's negligence, Plaintiff and Class Members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### DECLARATORY JUDGMENT
### (On Behalf of Plaintiff and the Class)

114.   Plaintiff restates and realleges the allegations contained in paragraphs 1 through 94 as if fully set forth herein.

115.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described herein.

116.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Avis is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Avis still possesses Plaintiff's and Class Members' PII and that Avis's data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of his PII and remains at imminent risk that further compromises of his PII will occur in the future.

117.    Pursuant to its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a.    Avis owes a legal duty to secure consumers' PII and to timely notify consumers of a data breach under the common law and Section 5 of the FTC Act; and

    b.    Avis continues to breach this legal duty by failing to employ reasonable data security measures to safeguard Plaintiff's and Class Members' PII still in its possession.

118.    This Court also should issue corresponding prospective injunctive relief requiring Avis to employ adequate security protocols consistent with law and industry standards to protect consumers' PII in its possession.

119.   If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Avis's. The risk of another such breach is real, immediate, and substantial. If another breach at Avis occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

120.   The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Avis if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Avis of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

121.   Issuance of the requested injunction will not disserve the public interest. On the contrary, such an injunction would benefit the public by preventing another data breach at Avis, thus eliminating the additional injuries that would result to Plaintiff and consumers whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C. For damages in an amount to be determined by the trier of fact;

D. For an order of restitution and all other forms of equitable monetary relief;

E. Declaratory and injunctive relief as described herein;

F. Awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

G. Awarding pre- and post-judgment interest on any amounts awarded; and,

H. Awarding such other and further relief as may be just and proper.

## **JURY TRIAL DEMANDED**

A jury trial is demanded on all claims so triable.

Dated: October 2, 2024                    Respectfully submitted,


                                          _/s/ James E. Cecchi_
                                          James E. Cecchi
                                          **CARELLA BYRNE CECCHI
                                          BRODY & AGNELLO, P.C.**
                                          5 Becker Farm Road
                                          Roseland, NJ 07068
                                          Telephone: (973) 994-1700
                                          jcecchi@carellabyrne.com

                                          Gary F. Lynch*
                                          Patrick D. Donathen*
                                          **LYNCH CARPENTER LLP**
                                          1133 Penn Avenue, 5th Floor
                                          Pittsburgh, PA 15222
                                          Telephone: (412) 322-9243
                                          gary@lcllp.com
                                          patrick@lcllp.com

                                          *pro hac vice forthcoming*

                                          *Attorneys for Plaintiff and the Proposed
                                          Class*